The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Steigman presiding. Good afternoon, counsel. This next case is 4-24-0093 Gorski et al. v. Catherine Shaw Bethea Hospital et al. For the appellant, counsel, please state your name. Michael Rasek for the plaintiff's appellant. Thank you. For the appellee, counsel, please state your name. Mark Meyer. Thank you, counsel. The appellant will have 20 minutes to argue, the appellee 20 minutes to argue, and then the appellant will have a five-minute rebuttal, if he wishes. So with that, then, Mr. Rasek, you may proceed, sir. Thank you. Good afternoon, Your Honors. As I said, my name is Michael Rasek. I'm here on behalf of the plaintiff's appellants, the Gorskis, Bill and Deborah Gorski. This is the case in which Bill Gorski awoke one morning, had some visual problems, went to see the defendant optometrist. Dr. Richardson scheduled some, did not diagnose what's called GCA, scheduled some tests for the following week. By the time the tests were performed, Mr. Gorski was pretty much lost all of his vision. The jury, of course, returned a verdict in favor of the defendants in this case. The first point I want to make, and in part because it should be dispositive of the entire case, is the Petrillo issue. As Your Honors are aware, there's no question about what occurred in terms of the facts. Defense counsel met with the treating doctor, the subsequent treating doctor, Dr. Welty, just before trial. Petrillo doesn't allow that, of course. And the only defense that they have for that meeting is the order that was entered about five years earlier. What do you mean the only defense? Why isn't that an order permitting it sufficient? Because that order did not let anyone, nor was it intended to let anyone on the defense side speak with somebody who worked for the hospital for whose conduct the hospital could not be liable. Part of the order says that. I'm sorry? What part of the order makes that clear? The order does not use those words. And my point is it doesn't have to use those words because the order otherwise would be going beyond the relief that the hospital requested when it first went in for that order. That order is really irrelevant, immaterial, because the order doesn't do any more than set out what the law already sets out. If the hospital, if the institution can be liable for one of their employees' conduct, then the institution can talk to those people, regardless of Petrillo. When the hospital went to court to get that order, they didn't say, we want to get an order that let us talk to everybody. They specifically addressed the proposition in their motion that, I think it's at 272, they specifically addressed the proposition that although only Dr. Richardson was named as a defendant, the plaintiff could potentially bring in other employees of the hospital as defendants, and it wanted the ability to talk to them. That's the only basis for that order. If the defense is, and if the court's going to accept that, now you have an order that greatly expanded the ability of the hospital to communicate with any employee at any time. If that's going to be the case, it pretty much, it destroys Petrillo. I'm not sure how a plaintiff's lawyer would guard against that. You'd have to check all the time. The bottom line is that, and I don't think there's any dispute about this, when the hospital talked to Dr. Welty, he could not be made a defendant, the hospital could not be liable for his conduct. Whether he individually could be made a defendant, why is it the case that the hospital couldn't be liable for his conduct? Because the statute of limitations had run at the time they talked to him, keeping in mind that they talked to him just before trial. It's only by coincidence we even found out about it. The statute of limitations had long since run, and an order had been entered dismissing Dr. Welty with prejudice. That's on the merits, means he didn't do anything wrong. That eliminated any potential liability on the part of the hospital for Welty's conduct. Other than that, the logic should be fairly simple. Unless the court's going to read the order to go beyond what was asked for in the first place, and certainly plaintiff's counsel had no reason to believe that the order was going to ask for or give more relief than was requested, that should not have been allowed to occur, and that would void the entire trial. Let me raise this question. I don't know if you can hear me. I do, I can. Why didn't you move, based upon these changed circumstances, to vacate, amend, and modify the order? I can't. Could you hear me? I can. Yes, I can. I have no problem hearing you, Your Honor. Okay. Because, because that went to change. Your argument that the order became modified based upon changed circumstances, even though the court was never asked to address the order? Yes, exactly. That the order became moot because of the changed circumstances. The changed circumstances were that the hospital could no longer be responsible for Dr. Welty's conduct. Well, that's your conclusion, counsel. If I'm the trial judge, and I entered this order, and a party thinks that the order no longer should exist because of changed circumstances, it seems to me I would require the party so believing to call a matter to my attention to get a revision of my order. Why didn't you do that? I don't believe that was necessary. This court knew exactly what was going on, was made very clear to it that the order was never intended to address the situation. So we would be in a position of asking the court to change an order that was never intended to address the situation. Counsel, here's the problem. I want you to address this directly. This panel, we've all been trial judges, and our sympathies are all with the trial judge. And this is an involved, complicated case, procedurally and factually. And as a trial judge, I would expect the lawyers to keep me informed of what's going on and to draw no inferences that somehow the orders I entered are no longer valid because a party thinks circumstances changed. I don't understand how you can excuse your not calling this matter to the trial court's attention for a resolution. Because the court knew that the circumstances had changed. And how would the court know that? Are you expecting the court to be aware of these procedures to the same extent as the lawyers are on behalf of the parties? No, no, no, no, of course not. We told him at the hearing what had happened. It could have been, I don't think, more exhaustively argued, as were so many of the things in this trial, that in fact, the circumstances had changed. There's just no way the trial court judge... I'm sorry. Counsel, that's after the fact. I get that you told the judge that, Judge Ackert, after the fact. But if the question is, did the order change? The answer is clear. It didn't. The order says what it says. I think it's normally incumbent upon the party who says that the old order shouldn't say what it said then any longer. It's really incumbent upon you to bring that to the court's attention. Honestly, I think this stems from the fact that we didn't put names in there. That would have made this clearer. But I suspect if you did put names in at the outset, Welty's name might have been in there. I can't disagree with that because we actually named him as a respondent of discovery at one point. But I think the answer to both of your questions is that, at least from our position, no change was needed in that order. That order was never intended to address conversations with someone who cannot be made liable. And we know that because that was the basis for the motion. Let me put it this way. You say the order was never intended to do that. That's what the parties intended the order to be. If I'm the trial judge, I don't know and I frankly don't give a damn what their intention was. Here's the order that's been presented and I've entered. Why do I care? That your intention has now changed. Because if the order is being read to be beyond the scope of what the law allows, and that's clearly what the order does. If this order is allowing an institution to contact employees who cannot be liable, for whose conduct they cannot be liable, it's way beyond the scope of the law. And if it's way beyond the scope of the law, and I understand we've all been in trial courts, Your Honor, more than I have, that would surely raise a red flag as soon as somebody said, wait a minute, that's not the intent of the order. And the reason that it's not the intent is because I can show you the motion. And the motion says we're only worried about people who can be made defendants. And the trial judge knew that. I don't believe there's a situation where we tried to put one past the trial court by moving quickly. I agree with you, counsel. I don't think anyone tried to pull anything on anyone. But the problem is, if the order, the black letter of the order says one thing, you want us to basically impose consequences on the other side based on what you think the order should say today, and yet it wasn't changed. And my response is, I don't think the order needed changing, because when the order was written, it was only intended to cover the circumstance where the person being spoken to, in this case, could be liable or a hospital could be liable for it. As agreed, though, we lawyers are pretty careful about saying things once, twice, and three times. We don't typically rely on, well, that's no good anymore. We would rely on that if, in fact, I can show and we showed the trial court that the intent of the defendant in the first place was that that order is only directed to people for whose conduct they could be sued. Otherwise, we would have, before we would modify that order, we would have to look at the order, hear about Dr. Welty's involvement with the defendant, and say, oh, this order was never, this order allowed them to do that, but the order doesn't allow them to do that. And I understand, you know, Justice Steigman's comment, doesn't have specific words in it. But the trial court judge is not oblivious to the existing law, Petrillo. Every trial court judge who's been there knows you can, in fact, you can. It's permissible to talk to people who are employees for whose conduct you could be liable. We don't need an order for that. This order didn't go beyond that. I suggest what the court is doing, at least with this one, is reading something into the order that's not there, that you can talk to anybody whether or not their conduct could be a basis for your liability. Counselor, the order says what it says, right? They are hereby allowed to conduct ex parte discussions with KSB hospital employees, right? Right. It doesn't have a time limit. My point, it doesn't need a time limit because it's well known you can't do that if you don't have a basis for it. Otherwise, what the court is doing is reading language into the order that the hospital never asked for. That's really what's happening. I remember the hospital's motion was very limited. And if I get an order pursuant to a motion, there's no reason. I don't think anybody- Was it an agreed order? I don't actually recall. I'm not sure it shows. I don't, I'm not sure, Your Honor. There was no hearing that's in the record on it as far as I know. But even if it wasn't an agreed order and you're suggesting to us that the language in the order was beyond what the motion called for, isn't there a burden on you to call that to the attention of the trial court and say, wait a second, Judge, this order you entered, that wasn't specifically requested. Indeed, it's not permitted. And my point is, from our position, the order did not have, did not allow for more than the motion asked for. Because if the order, if we're going to read the order to allow for more than what the motion asked for, we're now basically saying the order violated Petrillo itself. And that shouldn't be the case. I'm watching my clock tick down, Your Honor. I need to move on. The next point I'd like to address, and it's as complicated as anything else in the case, is the problem with Dr. Ajemian. Dr. Ajemian was their optometry expert. The background on this point, and it has to do with Ajemian's testimony about diabetes and his use of Dr. K's deposition. And the two issue rule all sort of blend together because the defense did not have a causation expert in this case. The only causation expert was Dr. Cardin or the plaintiff. When they prepared for trial, somebody must have said, you know, we have a problem here. Let's think about this. We don't have a causation expert. And if we don't have a causation expert, if the jury accepts Dr. Cardin's argument on causation, that's going to guarantee that the jury is going to find Dr. Richardson guilty of violating the standard of care. Because when you have a failure to diagnose, once you prove causation, you pretty much prove a failure to diagnose. Counsel, that's not accurate. The breach of the standard of care is a separate and independent issue from the issue of whether it caused or contributed to cause an injury to the plaintiff. What you just said is not anything close to the law. And I respectfully disagree with that. So you can prove causation and you automatically get negligence? Is that what you're saying? No, no, no. If you can, in this case, in a failure to diagnose case, if you show causation is something other than what the treating doctor wanted, you've also shown that the treating doctor is potentially guilty of violating the standard of care. And once you do that, the standard of care and causation are so intermixed that the tuition rule can't apply anymore. That's my point. And in addition to that, that couples with the statement by Dr. Ajaymean that the cause here was diabetes. The owners are already aware, you've noted it's a complex case. Dr. Ajaymean took the stand and said his underlying disease, that's his diabetes was the cause. Dr. Ajaymean is an optometrist. He was only there for standard of care. He was not there for causation. When he was allowed to say diabetes was the cause, that both surprised the plaintiff and there was no grounds for it. He's not qualified to do that. He's an ophthalmologist, I'd rather an optometrist, not a medical doctor. And nobody's arguing that he was qualified to say it. They simply said, it's not really what he said. The trial court judge didn't think that's what he said, but they're all briefed at page 30, 31 and 32. I think each time, three times says his underlying disease, diabetes. Once he's allowed to bring out diabetes, we've got a causation issue. And in this case, the causation issue may not necessarily, as Judge Story said, but could very well influence the standard of care. And once you connect those two, the two issue rule doesn't apply anymore. The final point I'd like to raise here is the jury instruction. The judge changed our failure to diagnose instruction to failure to consider GCA. It didn't think it was significant. We would disagree for the reasons I think we hopefully clarified in the brief. If the accusation was failure to consider a diagnosis, that affected the standard of care and whether she violated it or not. Because the reason for Dr. Ajamian's statement that she did not violate the standard of care by not having tests done immediately was because she was only considering GCA. If in fact she had diagnosed, Dr. Richardson had diagnosed GCA, the tests had to be done within 24 hours that day. So that becomes a critical point. Even if standard of care and the injury are not locked together, that surely shows that allowing that causation in also could have affected the jury's decision as to whether or not Dr. Richardson did the right thing. And we know if Dr. Richardson had done the right thing, I don't think anybody disagrees. The result would have been, there's a presumption of that GCA was the illness. Dr. Soka said that without rebuttal, without any opposition. The only cure, the only remedy is steroid injections. Those have to be done quickly and we wouldn't be here today if that had been done. And so I wanna ask you before your time's up about closing arguments. You also are contending that something which constitutes grounds for reversal, but you didn't raise any issue about the closing argument in your post-trial motion. Haven't you forfeited that issue? We've only forfeited the issue if it had to be raised in the post-trial motion. I cited, I understand that most of the authority goes the other way, but I did cite authority for the fact that courts are, I think, becoming more liberal on that. And we also could fall back simply on the plain error rule that when you tell somebody something that's so wrong and it goes to the heart of the case, that should overcome everything else in light of the other issues that we see in the case as well. Well, plain error has hardly any application. This court and Supreme Court has held repeatedly in civil cases. This is a civil case, why should plain error be found here when you have a 53-page post-trial motion, as I recall, and you chose not to include concerns about the closing argument in it. That's correct. The fact that plain error is not often used doesn't mean it cannot be used. And it is applied in civil cases. It's just applied more frequently in criminal cases. We all know that, but it's not- It's applied almost never in civil cases, counsel. It's not just that it's more frequently in criminal cases. It's a very high bar. I'm not arguing with you on that, Judge. Why should we lower the bar to permit it in this case? Because in this case, the particular error goes right to the law that the jury considered. It went right to the heart of the case. It did exactly what I think the Nelson case, Booth case, says it should trigger plain error. It went to the law that the jury had to decide this case, and it was wrong. And if you give the jury the wrong law, you're not gonna get the right result. Only by coincidence are you gonna get the right result. Unless the court has further questions, I mean, at this time, we obviously ask that the court reverse and remand. Thank you, counsel. You will have another opportunity to address this in rebuttal. Mr. Meyer, do you have something you have to leave to me? Thank you, Your Honor. May it please the court and counsel. The plaintiff's here received a fair trial. The trial court appropriately exercised its discretion as to all issues. I think the one issue which Your Honor referenced is that Galish issue. And I believe that the case law here would suggest it has been forfeited and waived by the failure to raise it in the post-trial motion. And there's no circumstance in this case which would warrant the court's consideration of that issue. I would also note that in closing argument, plaintiff's counsel told the jury that they did not have to prove all three deviations, subsections A, B, and C. We just have to prove one of them. I would argue that there's no prejudice demonstrated here. Plaintiff made virtually the same argument. But more importantly, the instructions as a whole provided by the court appropriately instructed the jury on what they were to consider and how they were to go about taking their task. But back to the issues in terms of the trial court's discretion. I think that this court should find there was no violation of a patient physician privilege or commonly referred to as Petrillo as a result of defense counsel's communication with Dr. Welty. It was clearly allowed for and provided for in the order entered by the trial court on November 7th. So it's not necessarily pertinent, but I'm just curious as to that order, why was it sought and why was it entered? The order obviously was sought because as a defense counsel for the institution, who has knowledge of what events, what opinions or other information might be available from employees of the hospital. The order specifically addresses that employees of KSB who provided care in September of 2015 were within the scope of counsel's ex parte communications. The court clearly was balancing the patient physician privilege against the ability of the hospital to prepare and present its defense. And while counsel has suggested to this court that there is no liability possible, I think the answer is there is no individual liability of Dr. Welty. In the plaintiff's sixth amended complaint, which was pending at the time of trial, the plaintiff still had an allegation that the hospital was liable for the acts of its employees and agencies, including but not limited to Dr. Richardson. And so at least in theory, the plaintiff could have attempted in some manner to present some evidence. Now, they didn't have a disclosed 213 F3 expert, but conceptually or theoretically, the plaintiff could have adversely examined or cross-examined Dr. Welty to elicit some testimony about standard of care. And so- You said Richardson, is that, you mean Richardson or Welty that they were seeking liability through? The original complaint was named Dr. Richardson. The specific paragraph in the complaint against the hospital alleges that the hospital is liable for the conduct of its agents and employees, including but not limited to Dr. Richardson. In other words- But that's neither here nor there on our Petrillo discussion. The question is whether they were seeking liability against the hospital through Dr. Welty's conduct. Well- Because that's with whom the contact was made. In theory, the plaintiff could potentially seek to impose liability for Dr. Welty's conduct. And at the time of the communication, certainly the issue would be whether there was conduct on the part of Dr. Welty, which might give rise to liability of the hospital. I think counsel has conceded, and I would agree that Dr. Welty individually was insulated by the virtue of having been voluntarily dismissed twice. That does not in and of itself absolve the hospital for potential liability. Doesn't it, if the dismissal is with prejudice, doesn't that mean you can't hold the principal liable if you can't hold the agent liable? I don't know that the order actually provides for the dismissal with prejudice. It was essentially a second voluntary dismissal, which precludes the further action against Dr. Welty. But that does not necessarily exhaust the liability of the hospital. Was this order regarding this communication entered several years before trial? Correct. In the fall of 2017, prior to any depositions, the order was sought and entered by the trial court. Now there was some question whether this was an agreed upon order or not. Do you recall? This was not agreed. This was a contested order. The defense filed it. Well, I inquired as to whether the plaintiff would agree. They objected. I filed the motion and the trial court entered the order that has been referenced. Well, as you heard, Mr. Rathack has suggested that the order entered was not quite in conformance with the relief you requested. I'm not sure what that means, but what are your thoughts? The request for relief was for the hospital's counsel, our office, to communicate with any of the employees who provided evaluation care or treatment to Mr. Gorski in September of 2015. The operative window of time. And that's, in fact, exactly what the order provides, that any hospital employee who was providing care to Mr. Gorski in September of 2015 were allowed to have ex parte communications. The order entered was not beyond what was specifically sought in the motion for ex parte communications. And the purpose of the communications was consistent with what the defense had sought in obtaining that order. I apologize, Justice Beller. I was just going to say, did plaintiff's counsel approve the form of the order? I don't, I believe that the order actually was entered and circulated at the time. It does not reflect initials on it, but my partner was present and is, I believe, indicating that the actual content of the order was approved before it was handed up to the bench to be entered by Judge Jacobson. Justice Steigman, we did not hear your question, did not come through.  I think Mr. Meyer answered it sufficiently. I don't think I need to repeat it. But thank you for letting me know. I think that in this circumstance, it is absolutely unworkable for this order to be viewed as self-executing or self-limiting. I think that if the plaintiff thought that it had no further application, the burden was on the plaintiff to obtain some modification or order. Otherwise, we have a completely untenable and unworkable situation. At what point in time would the order end or be exhausted? The order is plain and straightforward on its face. It allowed the communication and the communications that took place were consistent with and within the scope of that order. And consequently, there is no violation of the patient physician privilege or patrillo. There's no change in the circumstances which would mandate or suggest such a change should happen automatically. Quite frankly, Dr. Welty testified to his actions, to his thoughts, his knowledge of Mr. Gorski's care and treatment and consistent with his deposition testimony. There is no abuse of discretion in the trial courts finding that Dr. Welty could appropriately and properly testify to those issues. And the trial court appropriately ruled on the challenge by denying the motion. And I think this court- So Mr. Ratzak didn't address it because he had other things to talk about, but I'm curious to hear your views with regard to one of the issues he raises on appeal, namely the admission to evidence of letters written by Dr. Marilyn Kaye and how that was, he claims, inappropriate. If I understand correctly, that was the admission of those letters were stipulated to the morning of trial or the day before trial, is that correct? That is correct, your honor. The exhibits seven and 11 were joint exhibits that were stipulated by the parties before there was any evidence presented at trial. The letters, medical records of Dr. Kaye are marked in the appendix as pages 27, 28, and 29 and very clearly set out her thoughts and opinions with respect to Mr. Gorski's presentation. It is critical to understand the timeline. Mr. Gorski was evaluated at KSB hospital in September of 2015, had vision loss and care was undertaken at CGH hospital in Sterling Rock Falls. They sought out a consult from the University of Wisconsin neuro-ophthalmologist Marilyn Kaye in November of 2015. At that time, Dr. Kaye saw Mr. Gorski as a patient in person, reviewed certain materials and records and came to the conclusion that it was most likely an embolic shower that is particles, whether they be cholesterol or blood clots elsewhere, traveled through the vasculature and obstructed the flow to the optic nerve first in the one eye and then later in the second eye. And she references very clearly that both she and the subsequent treating ophthalmologist, Dr. Han both found these. And so she makes a very important recommendation that is to taper the steroids. It is undisputed in this case, if you have giant cell arteritis, you must treat with high dose steroids. Her recommendation is to taper the steroids, to stop the steroids, which tells the treating doctors, she does not believe he has giant cell arteritis. He's seen again a couple of weeks later, nine days later actually. And she has looked at the biopsy slides which do not show evidence of giant cell arteritis according to her note. And she has looked at certain studies, finding evidence of plaque in the chest. And again, it tells the treating physicians, she believes this is an embolic phenomena and not likely giant cell arteritis and to taper and stop the steroids. And that's- One question, counsel. On the day of trial, these letters were stipulated to, along with some other items I understand were stipulated to. And yet during trial, when you wanted to refer to these letters, it was objected to, you were misusing it or the like. And I'm wondering, what's going on and how do you respond to that? So these letters were in evidence and on that basis alone, I believe allow argument from counsel as to the inferences, but they were also used with Mr. Gorski who confirmed the exact advice and understanding communicated and conveyed. And they were addressed with Dr. Welty as well. And he indicated that based upon her correspondence, he added- That has the feel of a Trojan horse. What difference does it make whether the client, the patient understands what the consulting physician's opinion was? There's no issue in the case about him failing to follow instructions. It sounds like you're just asking him that to get in to evidence the information about what the treating consultant's opinions are. It was already in evidence in terms of the exhibit, having been admitted by joint stipulation. So- Let me be more clear. And maybe that's my problem. Given the nature of the objections that were subsequently made and the remarks of my distinguished colleague, and I think he's clearly right on that. What was the point- How and why in your judgment did the plaintiff agreed to the stipulation only then during trial to object to the use of the letters that had been stipulated to evidence? I think the objection- Well, there's more history to the sequence. There was a motion in limine as referenced in the briefs attempting to keep the embolic issue and the court appropriately denied those. And the plaintiff's counsel indicated at that point that they would call their disclosed expert, Dr. Arda Holly, whom they had taken an evidence deposition of in preparation for trial to rebut any issue of an embolic phenomena. In fact, the plaintiffs did not do so. The plaintiffs did not call Dr. K to testify as well. The suggestion in the briefs is that Dr. K had recanted her testimony. And in fact, the record would indicate that's not what she testified to. At best, she said she would consider or hadn't fully considered. But at the time of her care and treatment of Mr. Gorski, where it was clear that it would have a direct impact on his condition, it is certainly appropriate for counsel, defense counsel, to have argued her findings and conclusions, her opinions. The trial court made specific findings in ruling on the motion, post-trial motion that all parties had agreed that Dr. K was an expert in neuro-ophthalmology and that she had found her letters to be competent evidence, which allowed her in part to provide the instruction to the 12.05 instruction. I believe that there was proper evidence admitted at trial for the use of the, or for the arguments in support of an embolic cause as a sole proximate cause defense in this case. That's a plaintiff stipulated to the use of Dr., or the admissibility of Dr. K's letter. Were you surprised when they objected during trial since there had just been a few days earlier to the stipulation? I think the objection was with respect to the use of the witness. I don't think the plaintiff ever objected to or sought to modify the fact that those exhibits, joint exhibits seven and 11 had been admitted. There was never a request of the trial court to limit their use or limit the information therein. The plaintiff sought no relief in regards to those, but did object to the use with Mr. Gorski or with Dr. Welty. I don't believe that the plaintiff has preserved the issue. They've essentially waived the issue by agreeing to and stipulating to its admission and evidence. That allows counsel to make reasonable inferences, argument and inferences from that evidence and the trial court appropriately found that evidence was a proper basis for giving the sole proximate cause based upon an embolic phenomena. The trial court similarly found that Dr. Welty's testimony was a proper basis, competent evidence as to the sole proximate cause based upon the conduct of others. I believe that the trial court's rulings in both regards was proper. And that it was not an abuse of discretion in either circumstance for those instructions to be provided and that evidence to be used in the manner in which it was. I would like to address the issue of Dr. Ajamian's testimony. Plaintiff's brief and argument today suggests that Dr. Ajamian testified that diabetes was the cause of Mr. Gorski's vision loss. Dr. Ajamian never said that. The defense never argued that. There is no citation to the record where Dr. Ajamian offered that testimony because in fact he did not. What he testified to at some length was there is a condition NAION which is a non-arteritic form which if you have diabetes or hypertension or elevated cholesterol puts you at risk of vision loss through a different process than AION which includes giant cell arteritis an inflammatory condition of the vessels. Dr. Ajamian and Mr. Gorski had evidence of diabetes causing dot hemorrhages and this is all set out in the brief having dot hemorrhages or evidence of diabetes which had impacted or affected his vision as the basis for Dr. Richardson's compliance with the standard of care in believing that NAION was his diagnosis. Dr. Ajamian's testimony never said that diabetes was the reason he had sustained vision loss or caused the vision loss that was present but rather testified it was reasonable under the standard of care to believe that NAION was the cause of his presentation. What Dr. Ajamian did state was I asked whether he had an opinion as Dr. Richardson's conduct had caused or contributed to cause the vision loss and he stated it did not. I asked what did he simply said his disease. He had very bad disease underlying disease. Judge Ackert in ruling on the motion the post-trial motion stated that this specific testimony very directly indicated that Mr. Gorski had suffered from an inflammatory disease, giant cell arteritis and that was what had caused his vision loss. Now, there was certainly a contested issue in this case as to whether Dr. Richardson's ordering of the test was timely and met the standard of care and there was certainly evidence on both sides of that issue, competent evidence. Dr. Ajamian's testimony does not, did not and does not stand for the proposition that his vision loss was due to diabetes. The whole premise of plaintiff's argument in regards to Dr. Ajamian's testimony is based on wrong, a wrong and factually incorrect assertion that he testified that diabetes was the cause of the vision loss. When Dr. Ajamian testified was, did the plaintiff seek any clarification of what he meant? I'm sorry, your honor, I didn't catch the last portion. Did the plaintiffs at trial sink any clarification of Dr. Ajamian's testimony about what he was referring to? No, your honor. I asked no further questions of Dr. Ajamian. The plaintiffs did not ask Dr. Ajamian with respect to an explanation or clarification of that specific point. What plaintiffs argue is that there was some volunteered statement by Dr. Ajamian and in fact, I see my time's up and so I will thank the court for your attention. Finish your remark. And I think with respect to that specific issue, Dr. Ajamian's testimony was simply that if he had been treated on Monday, that we wouldn't be in court, but the consequence of that is none because that's exactly the testimony of plaintiff's neuro-ophthalmology testimony. So Dr. Ajamian's arguable testimony and causation was simply cumulative of what the plaintiff's case was and as to answer your question, there was no clarification, no expansion of that answer. And I thank you for your time.  Mr. Ratzak, on behalf of the plaintiff, you may make your rebuttal argument, sir. Thank you. Going to the last point first, the suggestion that when something comes in wrongly or potentially wrongly, the person opposing that has the duty to examine that witness to see if they can make it clear would simply just make things worse. It's the person introducing the testimony that's got to make it clear, not the person who's opposing the testimony. Well, the trial court was of the opinion apparently in the post-trial motion that the testimony of Dr. Ajamian did not mean what you are saying to us on appeal you think it means. And it's that sort of clarification that could have been solved from the witness, so there'd be no question about it. That would be asking us to ask their standard of care witness about causation. Remember, Dr. Ajamian's only a standard of care witness. We don't want to go into causation with him. No matter what he, if he was talking about NAION or diabetes, the bottom line is he gave a causation opinion. He's not allowed to do that. Everybody agreed he was only a standard of care witness. Well, see, that's the problem, though, counsel. Again, we tend to view this record through the eyes of the trial judge, and the trial judge did not believe it was a causation opinion. You're saying that it was, and at best, that appears to be uncertain or confused. The trial judge didn't think so, and you could have clarified it if this is a basis for your claim that error was committed by having him make clear that this was a causation opinion, and then maybe you'd have a stronger basis to argue error on appeal. At page 2246, defense counsel argued when we were talking about this very issue at trial, I believe all that Dr. Ajamian suggested that his condition was due to the disease process. There is no way that that can be read, in my opinion, other than to be a causation opinion. He continued, there was no discussion, this is defense counsel, there was no discussion about anything related to what caused it, meaning Ajamian, other than the general reference to the disease process, again, causation. That's causation. Dr. Ajamian is not a causation witness. As soon as causation comes up with him, that's error, and I can't explain why the trial court judge ruled as it did. Dr. Welty was dismissed with prejudice. It's at page C-3358 of the record, which means he couldn't possibly have been a cause of liability on the part of the hospital, which is the whole point of Petrillo. Petrillo operates to let the institution talk to people for whom the hospital might be liable. And we know that the order was only intended to go that far. It's at page C-214. The hospital explained its whole reason for the argument, the whole reason for its order was that it could find herself the target of plaintiff's claims. That is, the hospital could find itself liable for Welty. That was the reason that they gave to get the order. If that's the reason for the order, I would ask the court why the opponent would ever read more into the order than that. Once that's gone, once they can't be held liable for his conduct, and that happened twice, statute of limitations and dismissal with prejudice on the merits, why would the plaintiff think that anything else had to be done? That's the end of it. Dr. Kay, a further part of Dr. Kay, I'm sorry, I just didn't have time earlier, is that we weren't allowed to use the deposition of Dr. Kay. She did recant. I strongly disagree with counsel. The court's got the information. I quoted it in our brief. In her deposition, she said, I don't, she actually, if you read her deposition, she pretty much agreed it was GCA. But counsel, you cannot use a deposition to impeach a report. That's still hearsay. You have to bring the doctor in and get that in through her or some other viable means, but you can't, how is a report supposed to be impeached by a deposition? We were impeaching Dr. Ajamian with- It doesn't impeach him. It's not his statement. We're allowed to ask an expert if they've read something, whether they relied upon it. That would get it before the jury. That may be one of the oddities of our system, but that's how you get information before the jury that the other side doesn't want that expert to consider. And if we had done that, we could have possibly backed Dr. Ajamian into a corner and we could have done the same thing with Dr. Welty. Welty's opinion was based upon Dr. Kay's letters. The deposition says something to the opposite. We could have surely impeached, we could have impeached Dr. Welty directly with his own opinion there. Not the report, his opinion. We could have impeached Dr. Ajamian, his opinion, not the report. Mr. Ratzak, I gave Mr. Meyer an additional minute or so to finish up his argument. I'll do the same for you if you wish. No, I've said what I think, I hope what I need to say. Thank you for your time. Well, thank you, counsel. I thank both counsel for your arguments in this case. The court will take this matter under advisement and be in recess.